IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| John Hoffman, | : | |
| | : | Case No. 1:04cv293 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| CSX Transportation, Inc., | : | DEFENDANT'S MOTION FOR |
| | : | SUMMARY JUDGEMENT |
| Defendant. | : | |

This matter comes before the Court on Defendant CSX Transportation, Inc. ("CSX")'s Motion for Summary Judgment (doc. #16). For the reasons below, CSX's motion is **DENIED**.

I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff John Hoffman ("Hoffman") sued CSX under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 et seq., alleging that he was permanently injured by a chemical release while working as a utility man at CSX's Lind Yard in North Excello, Ohio. Hoffman avers that on a late afternoon in late May or early June, 2001,[1] he was helping to prepare a covered hopper railcar ("hopper") used to transport aluminum hydrate for return to its supplier. The hopper had been unloaded at a factory in nearby Middletown before arriving at the Yard, but according to Hoffman must have retained a residue of aluminum hydrate powder. Hoffman

---

[1] Hoffman does not recall, and CSX has been unable to determine, the precise date of the alleged incident. See Deposition Transcript of John Hoffman at 16-17; Doc. #16 at 1.

1

testified in his deposition that as he stood next to the track instructing the engineer to back the hopper into a line of standing railcars, and the hopper and other cars made contact, some of this powder escaped through an unsecured cargo door at the bottom of the hopper. See Deposition Transcript of John Hoffman ("Hoffman tr.") at 59-66, 76-79, 83-84.

Hoffman testified that he noticed a cloud of powder emerging from the hopper within a few seconds of the railcars' coupling. See id. at 84-98. He then took a deep breath of "good air," stepped into the space between the hopper and adjacent car, and spent approximately thirty seconds connecting air hoses and other equipment to complete the coupling. Id. By the time Hoffman emerged, the cloud had expanded so that he had to walk an estimated minute and a half and a hundred-plus feet away from the coupling, alongside adjoining railcars, in order to escape it. Id. Hoffman was forced to take a breath inside the cloud, but did not recall experiencing any special sensations or reactions either at the time or later in the day. Id. at 97-100, 107. He testified that the cloud dissipated within a few minutes, leaving a small pile of powder underneath the hopper, between the rails. Id. at 100.

Hoffman did not discuss the cloud with the engineer, the conductor–who Hoffman alleges would have seen the cloud from his vantage point across the tracks–or any of the other crew members on his shift the day of the incident. Id. at 100-107. He did not return to inspect the hopper, or file an accident report with CSX. Id. at 105-06. Nevertheless, Hoffman testified that he returned to the scene a few days later and collected a teaspoon or so of powder in a glass jar, "I guess, basically [to] turn it over to the safety committee and tell them, you know, like I said, there was no effects, but it–I know it wasn't good to breathe this stuff." Id. at 100-101, 107-110. As it happened, Hoffman simply sealed the jar, took it home and forgot about it until he turned it over

to his lawyer a few months later. Id. at 108-110. According to CSX, the sample was later forwarded to a laboratory by Hoffman's counsel and then lost at the laboratory. (Doc. #16 at 8.) Hoffman testified that the pile of aluminum nitrate under the hopper eventually dissolved in the rain, apparently before anyone else at CSX noticed or inspected it. Hoffman tr. at 155. CSX alleges that the hopper itself also left the yard uninspected. (Doc. #16 at 8.)

Within several weeks of the incident, Hoffman began experiencing extreme fatigue. Hoffman tr. at 125-26. In July 2001, he took a vacation and never returned to work for CSX. Id. at 140-41. Hoffman alleges that he is still unable to work or otherwise exert himself because of his chronic fatigue. Id. at 141-49. He has been on total disability since January 2002. Id. At 159-60. Hoffman's treating physicians have apparently attributed his fatigue and certain respiratory symptoms–including lung plaques and breathing difficulties, for which Hoffman takes medication, and chest colds–to his alleged aluminum hydrate inhalation. Id. at 141-58. However, it does not appear that the physicians attempted to analyze the sample Hoffman collected before making this diagnosis, see id. at 154-55, and the sample has since been lost.

Hoffman filed this suit in April 2004, alleging that CSX violated FELA by failing to properly maintain, inspect, repair, load, and/or secure the rail cars with which its employees worked; failing to maintain and inspect work areas; failing to provide appropriate protective gear, training, and warnings, and generally negligently failing to create a safe work environment. (Doc. #1 at 2.) He seeks damages for his "severe and permanent injuries" to his lungs and respiratory system, mental distress, lost wages and medical expenses. (Id.) In March 2005, after deposing Hoffman, CSX brought the present motion for total summary judgment. (Doc. #16.)

II.     **JURISDICTION AND STANDARD OF REVIEW**

The Court has jurisdiction over Plaintiff's FELA claims pursuant to 28 U.S.C. § 1331, and venue is proper under 45 U.S.C. § 56. Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn from that evidence, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III. ANALYSIS

CSX asserts that it is entitled to summary judgment under the equitable "reverse spoliation[2] of evidence" doctrine. In essence, CSX argues that Hoffman's failure to timely alert CSX to the powder spill or preserve his own sample of the powder has deprived CSX of any meaningful opportunity to contest Hoffman's factual allegations, and that Hoffman should therefore be estopped from pursuing this case. For the reasons set forth below, the Court

---

[2] The word "spoilation" is sometimes used to describe spoliation. See, e.g., U.S. v. Rodney, Nos. 92-3035, 92-3047, 1993 WL 280328 (6th Cir. July 26, 1993) ("spoilation"), citing in part United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir. 1986) ("spoilation").

**DENIES** summary judgment on CSX's spoliation theory.[3]

CSX's summary judgment motion rests primarily on a single, distinguishable opinion from a sister Circuit that purports to apply a "federal law of spoliation": Silvestri v. General Motors, 271 F.3d 583, 590 (4th Cir. 2001); see also doc. #16 at 9-11. CSX has not cited any recent cases from this Circuit that purport to apply the federal doctrine announced in Silvestri, and the Court is not aware of any. Spoliation doctrines have been recognized as part of a class of evidentiary doctrines that embody important issues of substantive state policy. See, e.g., 19 Charles Allan Wright, Arthur R Miller, and Edward H. Cooper (2d ed. 1996), § 4512, notes 25-30 and accompanying text. Therefore, the Court may properly refer–under Erie Railroad v. Tompkins, 304 U.S. 64 (1938), and its progeny–to relevant state law unless the spoliation issue

---

[3] On reply, CSX suggests that it is also entitled to relief on a common-law negligence theory, reasoning that Hoffman's failure to observe certain accident reporting rules in the wake of the powder spill constituted contributory negligence and negated all claims against the railroad. (See doc. #22 at 7-8.) Because this theory was presented only obliquely in CSX's opening brief, the Court declines to penalize Hoffman for failing to respond to it. In any event, even assuming that this common-law defense is cognizable in a statutory FELA action, the argument lacks merit. As CSX's cited authority confirms, not all violations of operating rules by railroad employees constitute legal negligence. See, e.g., Atchison, Topeka & Santa Fe R.R. v. Ballard, 108 F.2d 768, 770 (5th Cir. 1940). More importantly, Hoffman's alleged rule violations occurred *after* his exposure to the powder. (See doc. #16 at 8.) Therefore, even assuming arguendo that these violations were negligent, it is difficult to understand how that negligence could have caused Hoffman's injury. To the extent that Hoffman's reporting of the spill would have triggered a medical response, and this medical attention could have mitigated the ultimate health effects of inhaling the powder, Hoffman's violations of reporting rules may have contributed to his injuries. However, that prospect does not entitle CSX to relief at this time. Because the evidence–read in the light most favorable to Hoffman–suggests a reasonable jury could find CSX was also negligent, Hoffman's own negligence would *eliminate* any tort claims against CSX only under traditional contributory negligence doctrine. CSX has not even attempted to establish that this doctrine–employed in a minority of jurisdictions–should apply to this case.

clearly implicates an overriding federal rule or interest. See id. §§ 4512 and 4520.[4]

In this case, there does not appear to be any relevant overriding federal interest outside the context of Federal Rule 37, which authorizes federal courts to sanction parties for failing to comply with certain discovery requests. See Fed. R. Civ. Proc. 37; Beil, 15 F.3d at 551-52. CSX has not moved for Rule 37 sanctions.[5] (See Doc. #16.) The Sixth Circuit has recognized that Rule 37 does not apply when a party's alleged spoliation "occur[s] prior to the lawsuit," and held that remedies for this conduct "must be found in the substantive law of the case." Beil, 15 F.3d at 552 (reversing Rule 37 sanctions against party for disposal of critical physical evidence prior to initiation of lawsuit, and referring instead to relevant forum state law on spoliation). Because Hoffman's alleged injury and much of the alleged evidentiary spoliation took place at an Ohio rail yard, the Court refers to Ohio law.

The elements of spoliation in Ohio, as recently articulated by the Sixth Circuit, are (1) "pending or probable litigation involving the plaintiff"; (2) "knowledge on the part of defendant that litigation exists or is probable"; (3) "willful destruction of evidence by defendant designed to disrupt the plaintiff's case"; (4) "disruption of the plaintiff's case"; and (5) "damages proximately caused by the defendant's acts." Herlik v. Continental Airlines, No. 04-3790, 2005 WL 2445947, at *6 (6th Cir. October 4, 2005). Even assuming these elements may be "reversed" to apply to an

---

[4] This is true even though the present action arises under the Court's federal question, rather than diversity, jurisdiction. See generally id. at § 4520.

[5] Discovery has closed in this case. (See doc. # 15.) It is unclear whether CSX ever formally asked Hoffman to produce the allegedly spoliated evidence. CSX may have simply concluded that any such requests would be futile.

6

allegedly spoliating plaintiff,[6] the Court finds that genuine issues of material fact remain as to whether Hoffman has satisfied several elements of the Ohio test.

With respect to the second Ohio element, or knowledge of probable litigation, a reasonable jury could conclude Hoffman was not anticipating litigation at the time he let the hopper car leave Lind Yard uninspected by CSX and collected his powder sample. Hoffman testified that he collected the sample three or four days after the incident, began to experience his eventually debilitating fatigue somewhere between three to four days and a week after the incident, and first consulted his doctors about this fatigue within a week or two of the incident. See Hoffman tr. at 107-108, 125-26, 139-41. This evidence could support a finding that Hoffman knew or strongly suspected he was injured, perhaps even injured enough to warrant litigation, when he collected the sample. Certainly, Hoffman's decision *to* sample the powder, and his acknowledgment that he knew inhaling it was harmful, suggest he understood within a few days of the alleged spill that the powder–and perhaps also the hopper–would be relevant to some sort of proceeding. However, a reasonable jury construing the facts in the light most favorable to Hoffman could also conclude that Hoffman did not yet realize he had been personally harmed by the powder, had no intention of suing CSX over the spill, and anticipated–at most–an investigation by CSX's safety committee.[7] (See, e.g., doc. #21 at 4.)

In contrast, by the time Hoffman's retained counsel forwarded the powder sample to a laboratory a few months after the incident, Hoffman was almost certainly anticipating litigation

---

[6] See, e.g., Beil v. Lakewood Eng. and Mfg. Co., 15 F.3d 546, 553 (6th Cir. 1994) (discussing alleged spoliation by plaintiff).

[7] Hoffman urges.

7

for purposes of the second element of the Ohio spoliation test. However, there remains a genuine dispute of material fact as to the third Ohio spoliation element, willful destruction of evidence. This Circuit has emphasized the need for some threshold showing, under Ohio law, that evidence has been "*intentionally* altered or destroyed by a party or its expert before the defense had an opportunity to examine" it. See, e.g., Nationwide Mutual Fire Ins. Co., v. Ford Motor Co., 174 F.3d 801, 804 (6th Cir. 1999) (emphasis added, internal citation omitted). There is no indication that Hoffman or his counsel ever deliberately restricted CSX's access or otherwise acted in bad faith with respect to the sample. Rather, as CSX acknowledges in its papers, it appears the laboratory where counsel sent the sample inadvertently lost it. (See doc. #16 at 8.) Therefore, Ohio spoliation law does not support a grant of summary judgment to CSX.

Summary judgment is also inappropriate under CSX's cited authority, Silvestri v. General Motors. Plaintiff Silvestri sustained disfiguring injuries in a car crash after the airbag in his Chevrolet did not deploy. See Silvestri, .271 F.3d at 585-86. He sued General Motors nearly three years later, claiming that he would not have been disfigured if the airbag had functioned properly. Id. at 586-87. Shortly after the accident, Silvestri's family had retained an attorney who commissioned experts to inspect the car and accident site and prepare written reports of their findings. Id. at 586. After this inspection, but well before Silvestri filed his lawsuit, the vehicle was turned over to the owner's insurance company and then repaired and resold. Id. at 587. When General Motors eventually located and inspected the car, it found no apparent damage to or defects in the airbag module. Id. However, because General Motor's inspection took place after the repair and resale, General Motors could not conclusively establish that the airbag module was the same one present in the car at the time of the crash. Id.

The Fourth Circuit concluded that Silvestri's failure to preserve the car in its damaged state pending General Motors' inspection was so prejudicial to General Motors that the most equitable solution was to dismiss Silvestri's lawsuit. The Court reasoned that litigants have a duty to preserve material evidence not only in litigation, but during that "period before litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Id. at 591 (internal citations omitted). It noted that when a party "does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence." Id. However, the Court also cautioned that dismissal is a "severe sanction" for spoliation of evidence, "usually justified only in circumstances of bad faith or other 'like action.'" Id. at 593. Specifically, the Court found that dismissal should be limited to those spoliation cases where either (1) the "spoliator's conduct was so egregious as to amount to a forfeiture of his claim," or (2) "the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." Id.

With respect to Silvestri's threshold requirement that the allegedly spoliating party act in reasonable anticipation of litigation, the Court has already determined that a reasonable jury could find Hoffman did not anticipate litigation when he failed to report the alleged spill and collected his powder sample.[8] While Hoffman presumably *did* expect litigation–and, consequently, had a duty to preserve evidence–by the time the sample was forwarded to the laboratory, Hoffman's conduct cannot fairly be characterized as "egregious" under the first prong of Silvestri. As discussed above, there is no evidence that Hoffman or his counsel willfully destroyed or altered

---

[8] The Court further notes that unlike the plaintiff in Silvestri, Hoffman apparently had not retained counsel or experts at the time this evidence was lost. See Silvestri, 271 F.3d at 585-86.

9

the sample; rather, the sample appears to have been negligently lost by, or enroute to, a third party. Therefore, CSX would be entitled to summary judgment under the logic of Silvestri only if the alleged spoliation has "substantially denied" CSX its defense.

The question of substantial denial is a close one, but the Court concludes that CSX's defense has not been so undermined. CSX asserts in its papers that there is now "no way to explore either the condition of the [hopper] door or analyze what allegedly came out of it." (Doc. #16 at 8.) While it would have been ideal for CSX to examine the accused hopper and surrounding area immediately after the alleged incident, the loss of this opportunity does not mean there is no useful evidence bearing on Hoffman's claims. It may be possible to use shipping and maintenance records to locate and inspect the hopper and form certain conclusions about its condition at the time of the incident. As Hoffman notes in his response to the present motion, CSX could presumably also obtain another sample of aluminum hydrate in order to analyze its potential inhalation effects.[9] (See doc. #21 at 6-7.) On balance, therefore, summary judgment is unwarranted under Silvestri.

In declining to grant summary judgment, the Court does not mean to suggest that CSX was not prejudiced by the evidentiary losses at issue here. Without access to Hoffman's sample and contemporaneous observations of the alleged accident site, it will be more difficult for CSX to evaluate the fundamental issue of whether, in fact, aluminum hydrate did spill from the hopper and envelop Hoffman on the day in question. However, these losses also prejudice Hoffman, who

---

[9] Hoffman does not appear to be claiming that the alumnium hydrate he inhaled, unlike the allegedly defective airbag at issue in Silvestri, was in any way unique. Therefore, to the extent CSX intends to dispute the health effects of alumnium hydrate inhalation, it can rely on evidence developed from other samples. The loss of the original sample is probably most prejudicial with respect to the issue of whether Hoffman was ever actually exposed to aluminum hydrate, as opposed to the issue of whether Hoffman could have been injured upon exposure.

must now rely on personal recollections and after-the-fact medical testimony–uncorroborated by the sample and timely accident reports–to make his *prima facie* injury showing. It is hard to imagine that Hoffman would have chosen to build his case on such a fragile foundation. Moreover, to the extent that evidentiary losses have *disproportionately* prejudiced CSX relative to Hoffman, that imbalance could presumably be corrected with trial rulings preventing Hoffman from referring to any evidence the Court ultimately concludes was unfairly kept from CSX, or instructing the jury to draw negative inferences from the absence of this evidence. See, e.g., Nationwide Mutual Fire Ins. Co., 174 F.3d at 804; Beil v. Lakewood Eng. and Mfg. Co., 15 F.3d 546, 551-52 (6th Cir. 1994). Indeed, the Sixth Circuit has recognized that "[t]he unavailability of evidence due to plaintiff's pre-litigation destruction . . . do[es] not *necessarily* mandate dismissing the case or granting summary judgment. Beil, 15 F.3d at 553 (emphasis in original). Rather, "[c]ases are often tried even though a crucial piece of evidence is unavailable," with courts addressing any latent prejudice through tailored evidentiary rulings. Id.; see also One Beacon Ins. Co. v. Broadcast Dev. Group, Inc., No. 04-5517, 2005 WL 2077499, at *4 (6th Cir. August 29, 2005) (internal citations omitted) (endorsing penalties short of dismissal where the facts suggest missing evidence was not maliciously lost or destroyed).

To resolve CSX's present motion, the Court need not determine precisely how the evidentiary losses at issue here should be addressed when and if this action goes to trial. The Court therefore finds only that the available facts–considered in light of required inferences, and the relevant authority on spoliation–do not entitle CSX to summary judgment at this time.

**IV. CONCLUSION**

11

For the reasons above, Defendant CSX's Motion for Summary Judgment is **DENIED**.

IT IS SO ORDERED.

                                                              ___s/Susan J. Dlott_____
                                                              Susan J. Dlott
                                                              United States District Judge